[No. 3963.]

## WHIPPLE, SECRETARY OF STATE, v. BROAD.

1. ELECTIONS—PARTY CONVENTIONS—PARTY POLICY.

The action of a regularly called and organized convention of a political party upon questions of party policy is conclusive upon the courts in the absence of proof that the convention was improperly influenced, or that the delegates were not members of the party which they claimed to represent. The courts have no control over questions of party policy.

2. POLITICAL COMMITTEES—POWER TO REMOVE.

Where a political party was organized in a state, held a state convention and elected a state central committee and chairman thereof, and afterwards electors of different states adopting the same principles met and organized a provisional national committee to act until a national convention of the party should be called, the chairman of the national committee had no authority to remove from office the chairman of the state committee.

3. PARTY CONVENTION.

Where a political party convention is regularly called and meets, it is authorized to proceed with the business for which it is called, and represents the political party whether a majority of the delegates entitled to seats in the convention are in attendance or not. A majority of the delegates in attendance would be competent to act and bind the party. And the fact that some of the delegates denied the authority of the regular and lawful chairman of the state central committee to call the convention, and claimed that another person was the proper chairman to call the convention, and attended a convention called by the other person, could not make the regular convention irregular, even though by their absence the number of delegates in the regularly called convention was reduced to less than a majority of the whole number of delegates entitled to seats.

4. POLITICAL PARTY—CHANGE OF PRINCIPLE.

Where a political party through a convention regularly called for that purpose by a majority of the delegates in attendance declares what the policy of the party shall be, the court, in the absence of proof of fraud that would vitiate the action of the convention, cannot substitute its judgment for that of the convention, or visit its acts, even though they constitute a change of the principles upon which the party was founded, with the penalty of a forfeiture of the right longer to use the party name or emblem.

*Upon Review from the District Court of Arapahoe County.*

Messrs. BARTELS & BLOOD, Mr. VICTOR A. ELLIOTT and Mr. HENRY M. TELLER, for petitioner.

Mr. JOHN R. SMITH and Mr. THOMAS WARD, JR., for respondent.

CHIEF JUSTICE CAMPBELL delivered the opinion of the court.

This controversy is between two factions of the state Silver Republican party of Colorado, the object being to determine which one has the right, at elections, to the use of the party name and emblem. Under our Australian ballot act the political party, by which any list of candidates is nominated, may be designated on the official ballot by an appropriate emblem or design, but no two sets of nominations shall have or use the same emblem or device; and each political party shall have the prior right to use the device used by it at the last similar election. In the pleadings, as in the argument, these factions are designated as the "Broad" and "Blood" factions, after the chairmen of the two state central committees, and for brevity the same appellation is used in the opinion.

Before the secretary of state, in whom the statute vests original jurisdiction to hear and determine such disputes, the Blood faction prevailed; in the district court of Arapahoe county, which has the power to review the rulings of the secretary of state, the findings of the latter were set aside, and judgment was entered in favor of the Broad faction. The discretionary power of this court, which the statute gives, is now invoked by the former to review that judgment.

The delegates from Colorado to the National Republican convention held at St. Louis in 1896 withdrew from that convention because of dissatisfaction with its action in relation to the free coinage of silver; and under their leadership there was formed in this state, by former members of the Republican party, what is known as the Silver Republican party of Colorado, and its basic principle was the free coinage

of silver at the ratio of sixteen to one by the United States alone. At the November election of that year the party had on the official ballot its state, congressional, and various county tickets, and then adopted as its name the Silver Republican party and chose for its device or emblem a dove bearing a scroll inscribed with the words "16 to 1;" and at all succeeding elections has maintained its organization, the same name and emblem, and has had its tickets on the official ballots.

At the regular November election of 1896 there was a fusion of the silver forces of the state, consisting chiefly of the Silver Republican, Democratic and People's parties, upon presidential electors and candidates for congress, but only a partial fusion as to state and county tickets. At the state election for supreme judge in 1897 the silver forces were not united, the Democratic and People's parties supporting one, while the Republican and Silver Republican parties supported another, candidate.

In the summer of 1897 a number of Silver Republicans from the different states of the Union met at the city of Chicago, and organized a provisional national committee of the National Silver Republican party to act in that capacity until a national convention of the party was called. Thereafter that committee, through its chairman Charles A. Towne and the chairmen of the National Democratic committee and the People's party national committee, issued a joint address to the people advising and recommending that all the friends of silver in the different states of the Union act in harmony at all elections for the purpose of carrying out the basic principle of free coinage of silver, as above referred to. The respective state committees of the Silver Republican, Democratic, and People's parties, of Colorado, prior to calling a convention of their respective parties, the present year, voted to act in accordance with such joint plan, and each appointed a subcommittee to attend a joint conference for the purpose, so far as they could, of binding their respective parties thereto. This joint committee, however, was unable to agree upon any

definite plan, and referred the entire matter to the state conventions of the respective parties when they should meet.

About forty-eight hours before the meeting of the state convention of the Silver Republican party, which was called to be held at Colorado Springs September 8, 1898, for the nomination of a state ticket to be voted for at the ensuing November election, the evidence shows that charges were made that Richard Broad, who, ever since the organization of the Silver Republican party of Colorado had been chairman of its state central committee, was not acting in good faith and for the best interests of the party, but was conspiring with the leaders of the Republican party to defeat the silver forces of the state, and turn over the organization of the party to the leaders of the Republican party. Charles A. Towne, chairman of the provisional national committee of the Silver Republican party, was summoned to the state, and, without any hearing or notice to Broad of any charges against him, summarily removed him from the chairmanship of the state committee, and appointed in his place James H. Blood. There is no question about the regularity of the proceedings of Broad and his committee in calling the state convention up to the time of the attempted removal.

When the delegates who responded to the call met at Colorado Springs, it was found that some of them were in favor of fusion with the Democratic and People's parties, and others opposed, and as the result of these differences two separate conventions were held in separate halls, one called to order by Mr. Broad, the other by Mr. Blood, each claiming to be the regular convention of the party. Each convention nominated a state ticket, and filed a list of its nominees with the secretary of state in accordance with the statute, each certificate being regular upon its face, and purporting to contain the regular nominees of the party.

The position of the respective parties here may thus be stated: The Blood faction claims that its list of nominees is entitled to the use of the party name and emblem because of its adherence to the basic principles of the party, and its

favoring a fusion of all the silver forces of the state; while, as they charge, the Broad ticket, being nominated by delegates to a convention which has departed from their basic principles, has no longer any right to the party name and emblem.

The Broad faction, on the other hand, claims its ticket to be the only genuine one, because it was nominated by a majority of the uncontested delegates who were regularly elected and responded to the call therefor duly issued, and that such majority had the unquestioned right to change the policy of the party, and even to depart from its basic principles, if it saw fit to do so. In other words, that the decision of a convention of the delegates of a political party with respect to party policy is final and controlling; that the same is purely a political question over which the courts have no control, their inquiry being limited to a determination of the question as to the regularity of the proceedings of the convention in accordance with the party customs and usages.

The record is voluminous and contains a vast amount of evidence upon issues which, in the opinion of a majority of this court, are entirely irrelevant. The evidence is unquestioned that the Broad state convention contained a majority of the uncontested delegates who responded to the call; and for this reason Mr. Justice Gabbert concurs with me in holding that the action of that convention is conclusive upon this court, in the absence of proof that the convention thus constituted was improperly influenced, or that its delegates were not members of the party which they claimed to represent. In our judgment the courts have no control over questions of party policy, but those must be determined by the party itself in its regularly called and organized convention. With the wisdom of the policy, we have nothing whatever to do; and even though the court may be satisfied that the action complained of is unwise and destructive of the party organization, that is a question solely for the party itself in its proper convention, and not for the court.

I have referred to the attempted removal of Chairman

Broad by the National Chairman Towne because I think it has an important bearing upon one phase of this question. From the record in this case I am satisfied that there was no authority for this act, and that the attempted removal was of no force whatever. I do not deem it necessary to go into this question at any length, for to my mind the act was so clearly unauthorized that a bare statement of the proposition is a sufficient argument in that behalf. It would be an anomalous and entirely unheard of proceeding if a self-constituted committee styling itself a provisional national committee of a political party could come into a state, and without any authority from the national, or state, convention of the party, proceed to remove at will, and without notice, the officers of the state organization formed prior to that of the national party. The significance of this is apparent when regularity, and composition, of the respective conventions are considered.

There is no question but that the Broad convention was composed of a majority of all the uncontested delegates. But if this were not so, and if we should agree with the contention of counsel for the Blood faction that this apparent majority was, in part, made up of members of a rival political party, viz: the Republican party, so that a majority of party delegates was not present, still we must hold that it was the regular convention of the party, for even if, prior to the temporary organization, a majority of all the lawful delegates entitled to seats in the convention under the party call were not present, still the convention could proceed with its business, and a majority of the delegates who did respond would be competent to act and bind the party. The fact that some of the delegates refused to recognize the authority of Broad, as chairman of the state central committee, and as a consequence claimed that Blood, and not Broad, was the only proper person to call the state convention to order, and therefore attended the convention called to order by Blood,—cannot operate to make the Broad convention irregular, even though their absence therefrom left less than a majority of the whole number of delegates. Were it otherwise, it would be impossible to

organize a convention at all, if, for any reason, a majority of those entitled to seats should fail to attend.

To the rule which we have laid down that that convention is the party convention which is properly summoned, called to order, and attended by a majority of the legally elected delegates, and that the proceedings of that majority will bind the party, there may be, and doubtless is, an exception. If fraud is alleged and proven of such a character as that the act of the convention is not the free and untrammeled expression of the will of the delegates, the rule may be otherwise. It is true that counsel for the petitioner representing the Blood ticket have vigorously contended that a fraud upon the party would be perpetrated if the Broad ticket should be declared to be entitled to the use of the party name and emblem. In the original argument this claim was based upon the proposition that the convention nominating that ticket departed from the basic principles of the party and was, in part, controlled by members of an antagonistic party in adopting a course that is destructive of the original object and organization of the party. As we have already seen, this, of itself, is not the character of fraud that would vitiate the proceedings of a convention. The members of a party may honestly differ as to the course it should pursue in elections. Some might believe that fusion with the Democratic and People's parties, or either, would be destructive of their own organization; and other members that an alliance of any kind with the Republican party would have the same result. So when a voluntary political party, speaking only as it can, through a majority of the legally elected delegates of the entire party in an appropriate convention called for the purpose of deciding upon questions of party policy, declares what its policy shall be, the court, in the absence of proof of fraud that would vitiate that act, cannot substitute its judgment for that of the party, or visit its acts, though they constitute a change of the principles upon which the party was founded, with the penalty of a forfeiture of the right longer to use the party name or emblem.

As we had a very limited time for the examination of the voluminous record before it was necessary to announce our decision, we requested counsel, after the case was submitted, to point out in the record evidences of fraud of such a character as would vitiate the work of the Broad convention, and further oral argument was heard. Nothing new was then brought to our attention, nor has our subsequent examination revealed anything which, in our judgment, will sustain any such claim made by counsel. If it could be shown that a sufficient number of delegates were guilty of fraud, or that their votes were secured by bribery or other improper means, or that members of a rival party improperly obtained seats in the convention, and controlled its action, so that the work of the convention would not be that of the majority of the party delegates, the court would be at liberty to go behind the action of the convention. But there are no such allegations in the pleadings in this case, and if there were, there is no sufficient evidence in support of it.

It is true the claim was made in oral argument that some members of the Republican party (an antagonistic party) were present and participated as delegates in the Broad convention, but the number present was not shown, nor did it appear that they controlled its action, or influenced the votes of the delegates conceded to be in regular standing. For aught that appears to the contrary,—indeed the proof itself sufficiently shows it,—there were present in the Broad convention as uncontested delegates and *bona fide* members of the Silver Republican party a clear majority of all those entitled under the call to membership in the convention, and that their votes determined its acts.

We can designate this controversy most fittingly by saying that in a contest for supremacy between two rival factions of the party over a question of party policy, the determination of which was properly submitted to a convention of delegates of that party, duly called for that purpose, and to nominate a list of officers in harmony with its decision, the Broad faction had a clear and undisputed majority thereof,

and nominated a ticket in line with its defined policy. The other, or Blood, faction, containing a minority of the delegates, nominated a different set of candidates in favor of a contrary policy. The ticket of the Broad convention, therefore, contains the genuine nominees of the party, and is entitled to the use of the party name and emblem.

The judgment of the district court, being in harmony with this conclusion, is affirmed.

*Affirmed.*

Mr. JUSTICE GABBERT concurs.
Mr. JUSTICE GODDARD dissents.

Mr. JUSTICE GODDARD dissenting.

I am unable to concur in the conclusion reached by my associates, or in the view they have taken in regard to many of the important features of this case. I cannot agree that the merits of this controversy are determined by the fact, that a majority of the delegates elected under the call, organized the Broad convention. I am willing to concede, as a general proposition, that the lawful representatives of a political party in convention assembled, acting in good faith, may change the policy or principles of that party as they may deem best, and that the policy they adopt is a political question which they may decide for themselves, and their action in this regard is not subject to judicial control. I deny, however, that the respondent is entitled to avail himself of this rule, under the facts disclosed by the record before us. The real question presented, by the issues in this case, and upon the solution of which depends the right, as between the contending factions, to the use of the name and emblem in controversy, is whether a faction of delegates, composed in part of persons inimical to the principles of the party they pretend to represent, can capture the party organization, abandon its fundamental principles and policy, and under the guise of party action, turn it over to its political enemies, thereby

depriving another faction of the party that remains true to its principles, of the right to retain and use the party name and emblem.

It is alleged in the answer that Broad and his associates were in a conspiracy to disrupt and betray the Silver Republican party into the hands of the administration Republican party; and that what is designated as the Broad convention was composed in part of, and dominated by, members of that party. On the other hand, it is averred that the Blood convention was composed of the true adherents of the Silver Republican party, who desired to maintain its integrity and carry out the purpose for which it was organized.

Section 20 of the election law, as amended in 1894, provides that when a controversy arises between different claimants for the same emblem, it shall be the duty of the court to "summarily hear and dispose of any such issues, with a view of obtaining a substantial compliance with the provisions of this act by the parties to such controversy."

By virtue of this amendment it became, and was, the duty of the court to hear and determine this controversy upon the issues presented by the pleadings, and ascertain from the evidence which of these factions rightfully represented the Silver Republican party. In order to do this, it was clearly within its province to inquire into the political status of the delegates composing them, regardless of the fact that an apparent majority of the duly accredited delegates were found in the Broad convention.

It is conceded in the majority opinion that the court is at liberty to go behind the action of the convention, if certain elements of fraud are sufficiently averred and proven; but it is said that the record discloses no such allegation or proof. It therefore becomes important to ascertain what is alleged and proven. As above stated, the answer charges that respondent and his associates were in a conspiracy to disrupt and betray the Silver Republican party into the hands of the administration Republican party; and that many of the delegates who composed the Broad convention were members of

that party, and were admitted as delegates for the purpose of carrying out such conspiracy. While it is true that the evidence relied on to show the alleged conspiracy is in its nature circumstantial, as it necessarily must be in such cases, yet it abundantly shows that through the machinations and active co-operation of open and acknowledged administration Republicans in selecting delegates who did not belong to the Silver Republican party, respondent succeeded in organizing a convention that repudiated the established policy of that party, and, in so far as they could, constituted it an auxiliary and ally of the administration Republican party. Ordinarily, the intent with which an act is done is best judged by its results. In brief, then, what are the undisputed facts?

The Silver Republican party was the necessary and logical result of the severance, by Senator Teller and other western Republicans, of their relations with the National Republican party, on account of the financial policy adopted by it in St. Louis in 1896. It was organized for the express purpose, and with the distinct understanding that it was to be in actual opposition to the Republican party on that issue. The cardinal principle upon which it was founded, and the paramount purpose for which it became an independent party, was to advance the cause of bimetallism and aid in re-establishing in this country the free and unlimited coinage of silver and gold at the ratio of sixteen to one. To make its efforts in this behalf effective, it adopted, and has uniformly carried out, a policy of co-operation with the other silver parties in the election of members of congress, senators and presidential electors who were in favor of, and would support, its principles of monetary reform, a policy so absolutely essential to the accomplishment of the paramount purpose for which the party was organized that it has been accepted as one of its vital and fundamental tenets. It is undisputed that respondent and his associates have united with the gold standard party in support of the same candidates, in the congressional districts, and in those legislative districts wherein state senators are to be elected who will have a vote for United

States senator (the only officials to be voted for who will have a voice in the settlement of the financial question); and are prostituting the name and emblem of the Silver Republican party for the accomplishment of a purpose the very opposite of that for which they were adopted, and had been theretofore uniformly used.

It is also in evidence that the respondent, who was seemingly in hearty accord with this admitted policy of the Silver Republican party, and who, as chairman of the state central committee, issued the call, wherein a fusion of all the political parties favorable to monetary reform, was recommended, suddenly changed his views, and declared his purpose to organize the convention in the interest of Mr. Guggenheim for governor, who had openly avowed his purpose to act in harmony with the leaders of the Republican party.

In further confirmation of the conspiracy alleged, it is shown that Mr. Blood, who was attempting to act as chairman of the state central committee after the deposition of Mr. Broad from that position, had obtained peaceable possession of the opera house, where the convention was called to meet, and that about 4 o'clock in the morning preceding the day upon which the convention was to assemble, he was forcibly deprived of such possession by Republicans and Broad people, acting in the interest of the Broad faction.

It is asserted as an unquestioned fact, that the Broad convention contained a majority of the uncontested delegates, and the conclusion reached by my associates is based entirely upon this assumption. On the face of the credentials, there appeared to be 281 uncontested delegates in the Broad convention, out of the 549 included in the call; which number, if actually present, would have constituted a majority of thirteen. But the evidence fails to show how many of the 281 so accredited with seats, were present. On the other hand, it does appear that there was included in this number the delegates from Pueblo, San Miguel and Jefferson counties, aggregating seventy-five, some of whom were adminstration Repub-

licans, and were not rightfully entitled to seats in a Silver Republican convention.

The delegates from Jefferson county were elected under a joint call issued by the chairmen of the county central Republican committee and the county central committee of the Broad faction of the Silver Republican party; and were also delegates to the McKinley county convention, as well as the Broad Silver Republican county convention. The Pueblo delegation was headed by Mr. Hubbell, who was an acknowledged administration Republican, and who afterward presided over the Republican convention that nominated candidates of that party for the state senate. It appears from the testimony that the delegation from San Miguel county was selected by a federal office holder, and was composed entirely of administration Republicans.

While it therefore appears, on the face of the credentials, that an apparent majority of the uncontested delegates organized the Broad convention, as a matter of fact it is not true that this majority was composed of lawful delegates of the Silver Republican party. As also stated in the majority opinion, the record does not disclose the exact number of delegates who were members of the Republican party who sat in the Broad convention. It does show, however, that many of the other delegations which took part in its proceedings were largely composed of members of that party, and were selected and sent to the convention by federal officials, and led by acknowledged administration Republicans.

On the other hand, it appears from the undisputed testimony, that the Blood convention was composed of delegates from nearly every county in the state, who were *bona fide* members of the Silver Republican party, whose loyalty to its principles was unquestioned, and who were honestly endeavoring to carry out the purpose of its organization. It is inconceivable to me how, in the face of this record, it can be said that the Broad convention was organized by, or that at any stage of the proceedings there was present, a majority of the delegates lawfully entitled, under the call, to seats in a

Silver Republican convention; or, how it can consistently be said that this was a representative convention of the Silver Republican party, whose action, under the rule laid down in the majority opinion, is exempt from judicial control. Nor can I understand upon what theory it can successfully be maintained that there was not sufficient proof of fraud to bring this case within the exception, that my associates recognize may exist, to the general rule which they lay down; it being undisputed that many of the delegates "were not members of the party which they claimed to represent," but were members of "an antagonistic party," and actively participated in the proceedings of the Broad convention. While, as before said, the exact number of such delegates was not shown, yet the conclusion is irresistible, from the result accomplished, that they improperly influenced and controlled the action of that convention. They were there for a specific purpose, and that purpose was accomplished. This of itself is sufficient to show the character of fraud that it is admitted would vitiate the proceedings of the convention. In other words, the action of a convention so constituted and dominated would not be conclusive upon the party it fraudulently attempted to represent. It seems to me that under these undisputed facts, it is clear that the Broad convention, as constituted, was not a genuine convention of the Silver Republican party. Therefore, the question as to the power of a legally organized political convention to determine the party policy is eliminated from this discussion. But the real and important question involved in this case is one beyond the mere right of a political party to change its policy; and that is the right of those who remain true and loyal to its principles, to invoke the power of the courts to protect their party from destruction at the hands of its political enemies, or betrayal through the treachery and fraud of its disloyal members. And as to this right, it seems to me there ought to be no difference of opinion. I think it may be stated as a self-evident truth, that self-preservation is an inherent right of political parties, as well as of individuals. Acting upon this theory, Mr. Towne,

chairman of the national committee of the Silver Republican party, undertook to remove Mr. Broad and appoint Mr. Blood chairman of the state central committee. That he was authorized by the national committee to exercise this right is shown by the undisputed testimony. But whether or not, as contended, the committee was without authority to invest him with such power, and the attempted removal was therefore inoperative, is not material to the determination of this case, since by his conduct Mr. Broad had forfeited his right to represent the party, and those who remained true and loyal to its principles had the right to repudiate his leadership, if such a course was necessary to prevent the betrayal and destruction of the party. The delegates who were its true representatives, among them the founder and acknowledged leader of the Silver Republican party, were advised that respondent intended to organize the convention in the interest of the administration Republicans. In order to preserve the integrity of the party and prevent such betrayal they refused to longer recognize his authority, and, exercising their undoubted right, organized the Blood convention.

Unless, therefore, the right of self-preservation be denied to a political party, their action must be upheld, and this convention be recognized as the lawful convention of the Silver Republican party, which I believe the right and justice of this case demands.