[No. 4281.]

SPENCER, COUNTY CLERK v. MALONEY ET AL.

1.  ELECTIONS—PARTY CONVENTIONS—RIVAL FACTIONS—NOMINEES OFFICIAL BALLOTS—JURISDICTION.

Under the amended section 13 of the Australian ballot act passed in 1897 (Session laws 1897 page 154) the filing officers in the first instance and the courts upon review have jurisdiction to determine the regularity of party conventions and the claims of rival factions of the same political party to have their nominees placed on the official ballot.

2.  ELECTIONS—POLITICAL PARTIES—COUNTY COMMITTEE—AUTHORITY TO CALL CONVENTIONS.

Under the customs of the Democratic party the county central committee has authority through its chairman to call a county convention and the primary elections for selecting delegates thereto, and the chairman is authorized to prepare a preliminary roll call of delegates elected at the primaries and entitled to participate in the temporary organization of the convention, which temporary roll call cannot be changed till the organization is effected.

3. SAME—PEACE COMMITTEE—DELEGATED POWERS.

Where there were two factions of a political party in a county, each faction having a central committee claiming to represent the party in the county, and the two rival committees agreed to surrender to another committee called a peace committee power over and concerning the calling and holding of primary elections and the county convention, and the nature of the powers conferred upon the peace committee and the manner in which they were to be performed were stipulated by a written agreement under which it was appointed, the powers of such peace committee were measured and limited by the written agreement and it could act only in accordance with its terms. And where such committee of five together with the chairman of the central committee were to receive and canvass the returns from the primaries and make up a preliminary roll call for the temporary organization of the convention such roll call could not be made up by less than a majority thereof or by four of the six members, and a roll call made up alone by the chairman of the peace committee, and sanctioned by only two other members thereof was without authority and a convention called to order by the chairman of the peace committee, while the agreement provided that it should be called to order by the chairman of the central committee, and which was organized upon the unauthorized roll call was not the regular party convention and was not binding on the party of the county.

4. PARTY CONVENTIONS—POWERS OF CHAIRMAN OF CENTRAL COMMITTEE.

The chairman of the county central committee of a political party with power to call a convention, has authority to exclude from the meeting place persons not having proper credentials and to prevent the assembling thereat of a convention other than the one called.

5. SAME—PEACE COMMITTEE.

Where two rival factions of a political party by their respective committees delegated to a peace committee the power to make up a preliminary roll call for the county convention in accordance with the written agreement appointing such committee and the peace committee violated the terms of the agreement and attempted to call and organize a convention upon an unauthorized roll call of delegates, such committee thereby forfeited its rights to act for the party, and the chairman of the county central committee had a right to resume his authority, prepare a roll call and organize the convention, and the convention so organized would be the regular convention of the party in preference to one organized by the peace committee and one faction of the party in violation of the agreement constituting such peace committee.

6. POLITICAL CONVENTIONS—REGULARITY—MAJORITIES AND MINORITIES.

Where a political convention has been duly called to order by the person having the power to do so, and the convention has been organized by him, such a convention is the regular one, though a majority of those elected as delegates thereto may not participate therein, and the fact that a majority of those claiming to be delegates to a convention left the hall designated in the call before the convention was called to order or organized by the proper person, and went to another place and organized a convention would not make the convention organized by such majority the regular convention of the party, nor would it deprive the convention organized in the proper place by the proper authority of its regularity even though a majority of those entitled to do so did not participate in such convention.

7. POLITICAL CONVENTIONS—RIVAL FACTIONS—RECOGNITION BY STATE CONVENTION.

Where there were two rival county conventions both claiming to be the regular party convention, the fact that the state convention recognized and seated delegates from one of them was not conclusive of the question as to which was the regular county convention when there was no contest before the state convention and no delegates were sent to the state convention by the other rival county convention.

8. POLITICAL CONVENTIONS—POWER OF DELEGATES TO BIND.

Delegates of a convention acting in their individual capacity cannot bind the convention by taking part in a rival convention. Such action could not estop the convention of which they were delegates to afterwards assert its regularity as against the rival convention in which they participated.

9. POLITICAL CONVENTIONS—ADJOURNED MEETINGS—RESCISSION OF FORMER ACTION.

Where a political convention after organization adjourns to meet at some future day they may at the second meeting rescind any action taken at the former meeting and the fact that such convention at its first meeting appointed a committee with authority to ratify the action of a rival convention would not preclude such convention at its subsequent meeting from proceeding to nominate candidates or from appointing a committee with power to make such nominations.

10. POLITICAL CONVENTIONS—RIVAL FACTIONS—ESTOPPEL.

Where two rival conventions claiming to represent the same party make nominations for office one of such factions may not claim an esstoppel against the other to assert the regularity of its own convention and nominees by reason of certain alleged actions of the convention and its delegates, where it is not claimed that such ineqitable action had

any influence in inducing the faction seeking the estoppel to make nominations nor that it would have made any different nominations but for such action.

*Upon Review from the District Court of Arapahoe County.*

The controversy, nominally, is between the respondenst here and the county clerk of Arapahoe county who refused to file, and print on the official ballot, the list of nominees for legislative, county and judicial offices certified to him by them as a committee appointed for that purpose by a nominating political convention. The real controversy is between two wings of the Democratic party of Arapahoe county designated in the record as the Maloney and Speer factions. At the hearing by the county clerk whom, as it is said, the statute clothes with power to pass upon such matters, the decision was in favor of the Speer faction. Upon a review of the proceedings, by the district court of Arapahoe county, the clerk's action was annulled and an order entered directing that official to print on the official ballot the list of nominees of each of the conventions of the respective factions theretofore certified to him. Both parties are dissatisfied with the decision of the district court, and an application is made here invoking the discretion of this court to review its judgment.

The findings of the trial court are here reproduced:

"*First:* That prior to and at the time of the holding of the state Democratic convention which was held in the city of Denver on or about the — day of June, 1900, there were in the county of Arapahoe two factions of the Democratic party, each one claiming to be the regular Democratic organization, and each of which had a county central committee claiming authority to represent the Democratic party of said county, and each of which factions appeared before said state convention with a list of delegates claiming admission as the regularly elected delegates to the said state convention.

"*Second:* That said state Democratic convention refused to admit or recognize either set of delegates, but provided by resolution for the appointment of a committee known as the peace committee, with power to settle the said factional fight, and to which appointment and said powers both of said factions assented.

"*Third:* That thereafter said peace committee, duly appointed, agreed that a settlement of said controversy should be reached by the calling of a primary election for the purpose of electing delegates to a county convention to nominate county officers and select delegates to the state, senatorial and congressional conventions of the Democratic party thereafter to be held.

"*Fourth:* That said agreement of the said peace committee further provided that the returns of the election should be made to the said committee, and a roll call made up by it, and for this purpose alone Thomas J. Maloney was made a member of said committee, and that the said convention when it assembled should be called to order by Thomas J. Maloney as county chairman, and thereupon the said peace committee should name the temporary officers of the convention, to all of which both factions agreed.

"*Fifth:* That the primary election returns were made to said committee and said committee being unable to agree upon the roll call because of protests filed by opposing factions, one-half of the members of said committee made out a temporary roll call and selected John T. Bottom to be the temporary chairman, George H. Post to be the temporary secretary, and Felix O'Neil to be temporary sergeant-at-arms, of the convention.

"*Sixth:* That pursuant to a call regularly issued and published by Thomas J. Maloney, as chairman, and Edward Keating, as secretary of the Democratic county central committee of Arapahoe county, Colorado, said call bearing date August 24, 1900, and set forth at length in the petition herein,

a convention of the Democratic party of said Arapahoe county, composed of delegates claiming to have been elected pursuant to said call, assembled in the city of Denver on the 7th day of September, 1900, at the Broadway theater.

"*Seventh:* That said delegates entered into the hall leading into said theater but found that they could not gain admission to said theater because of the fact that the doors were locked and the petitioner Maloney held the keys and refused the delegates admission thereto.

"*Eighth:* That for about two hours the delegates remained in said hall unable to obtain admission, the said Maloney announcing that he would not open the doors and would not permit a convention to be held with the temporary roll call as prepared by the chairman of the peace committee, whereupon Hon. Adair Wilson, as chairman of the peace committee, called the convention to order in the said hall and named the temporary officers hereinbefore mentioned Thereupon the said Bottom assumed the duties of the office conferred upon him.

"*Ninth:* That after said convention had been so called to order the said Maloney opened the said doors and the delegates went into said theater and Thomas J. Maloney, the petitioner herein, as chairman of the democratic county central committee of said Arapahoe county, who signed and issued said call, called the convention to order and Edward Keating was elected temporay chairman and Frank E. Carstarphen was elected secretary. Prior to calling said convention to order, said Thomas J. Maloney, as chairman of said county central committee, pursuant to authority conferred upon him by resolution of said county central committee, had made up a temporary roll call of delegates for said convention.

"*Tenth:* That great confusion and tumult arose in said theatre, and thereupon said John T. Bottom appeared upon the said platform and announced that he adjourned the con-

vention to meet at once at the Coliseum hall in the City of Denver, because said Maloney claimed that he had rented the theater personally and did not want a convention held there. Immediately upon said announcement being made, a large majority of those claiming to be delegates went to said Coliseum hall and there a convention was regularly held for the purposes for which it had been called to order by Hon. Adair Wilson, the temporary organization being made permanent and credential committees and other committees, being regularly appointed. Some of the delegates from the Broadway theater went to the convention at the Coliseum hall and took part therein, appearing before the credentials committee, and contesting the seating of delegates and in some instances securing seats for themselves in said Coliseum hall convention. The credentials committee having made its report to the convention at the Coliseum hall, it proceeded to, and did, elect delegates to the state Democratic convention thereafter to be held, and said state convention thereafter duly and regularly held recognized and seated the delegates so elected by said Coliseum Hall convention. Thereafter the said Coliseum hall convention in regular session made the nominations for county officers which are being protested by the petitioners in this cause.

*Eleventh:* That after the withdrawal of such persons from said theater the delegates remaining in said theater effected a permanent organization by the adoption of the temporary roll call, made up by said Thomas J. Maloney, as the permanent roll call of the said convention, and by the election of the temporary officers of said convention to be the permanent officers thereof. At the time the permanent organization of said convention, was perfected, there remained in said Broadway theater a large number of persons who were delegates, or claiming to be delegates thereto, which number the court finds to have been approximately two hundred.

That thereafter and on said 7th day of September said convention transacted certain business and adjourned subject to call.

"*Twelfth:* That thereafter and on September 27th, 1900 said convention re-convened and thereupon a committee of seven was appointed for the purpose of making nominations  *  *  *  * ."

The finding further sets forth that this committee duly made the nominations for which the convention originally was called and prepared the proper certificates and presented the same for filing with the county clerk as the statute directs. The 13th, 14th, 15th, 16th, 17th and 18th findings relate merely to formal matters which perfected and made legal the acts of the nominating committee. There is no dispute about these facts, and it is not necessary to set forth the findings at length.

Mr. W. H. BRYANT, Mr. H. H. LEE and Mr. A. L. DOUD, or petitioner.

Mr. CALDWELL YEAMAN and Mr. F. E. CARSTARPHEN, for respondents.

CHIEF JUSTICE CAMPBELL delivered the opinion of the court.

The learned judge of the district court, perceiving that the controversy was one between two factions of the same political party, each claiming to represent, and each claiming to have duly made nominations in behalf of, that party, felt bound to follow the decisions of this court in *People v. District Court*, 18 Colo. 26, and *People ex rel. v. McGaffey*, 23 Colo. 156, and so ordered both tickets to be printed on the official ballot. In the former case, decided in 1892, speaking of a substantially similar controversy before the secretary of state, this court said: "Our conclusion is that

under the circumstances disclosed by this record, neither the secretary of state nor the courts are called upon to decide which of the two rival conventions was entitled to act for the Democratic party of Colorado. Until some statute clothes some tribunal with such power, the matter should, in our judgment, be left for adjustment elsewhere." The secretary of state, therefore, was directed to certify both sets of nominations to the county clerks to be printed upon the official ballot; and in the *McGaffey case,* decided at the September, 1896, term, the same doctrine was applied.

Were the question *res nova,* particularly in the light of the experience which a different construction has afforded, we would be inclined to hold as did the district court in the case at bar. And fortified, as we are, with these two decisions on the meaning of the act as it was originally passed, it would not be a difficult matter by sound reasoning to show that none of the amendments of the act has necessarily imposed upon the courts the duty of settling the factional controversies of a political party, but that now, as at first, the rule should be that a political organization must determine for itself all such controversies between its contending factions, under penalty of having the tickets nominated by all of them placed on the official ballot if the party fails to adjust their differences. At all events, with these two decisions, which have never been expressly overruled or adversely commented upon by this court, upholding its conclusion, the district court was justified in following them. It might well as in fact it did, and as is the duty of inferior courts, leave to the tribunal of last resort the initiative in definitely announcing a doctrine contrary to its own previous rulings.

Though, as already intimated, this court has not expressly decided that the doctrine of the foregoing cases is no longer applicable under the statute as it now stands, still in a number of decisions it has assumed jurisdiction to settle, and has settled, similar party disputes under authority of the

amended section 13 of the Australian ballot act passed in 1897. Session Laws 1897, 154. That amendment provides that the officer with whom the original certificate of nominations is filed shall pass upon the validity of all objections, whether of form or substance. A practical construction has been by us given to this section authorizing the filing officer in the first instance, and the courts upon review, to determine the regularity of party conventions and the claims of rival factions of the same political party to have their nominees placed on the official ballot. This was done in the following, among other, cases: *Leighton v. Bates*, 24 Colo. 303; *Liggett v. Bates*, 24 Colo. 314; *Whipple v. Owen*, 24 Colo. 319; *McCoach v. Whipple*, 24 Colo. 379; *Whipple v. Broad*, 25 Colo. 407; *Whipple v. Wheeler*, 25 Colo. 421.

It is true that consent of parties does not confer jurisdiction of the subject matter, neither will it necessarily invoke the discretion which this court has, under the statute, to review judgments of the inferior courts in election cases, but it should be said that in none of these later cases was the power of the court mooted, nor was our attention called to these former decisions. Neither party relied upon the doctrine of the earlier cases, but both urged the court to settle their disputes. The practice has thus grown up of entertaining such applications. To such an extent has it been encouraged that it may almost be said that political parties have rightly rested upon the belief that courts would determine such matters, and, except for extraordinary reasons, we ought not now to depart from what seems to be considered the established practice, though, in my judgment, it should never have been adopted.

We have, therefore, particularly as both parties strenuously urge us to do it, concluded to settle the controversy between these rival factions. Fully aware of the bitterness which disputes of this sort engender, and conscious of the futility of the attempt to satisfy contestants or allay the par-

tisan strife out of which · their differences spring, we shall dispose of this case, just as we do other questions, solely as we believe the facts and the law require. The conclusion reached by the district court was after both sides had introduced voluminous testimony in support of their respective claims, and that tribunal made findings of fact, set forth in the statement, which, if sustained by the evidence, as a careful examination of the record satisfies us that in substance they are, compel a decision in favor of the Maloney faction.

The principal and fundamental question is, which of the two nominating conventions was the regular one? This is controlling, for we have held that that one of two or more rival nominating conventions which, according to the usages of the party and fair dealing, is the regular one is entitled to have its nominees, to the exclusion of the lists of the rival factions, appear upon the official ballot. And if neither convention is in all respects regular, then the inquiry is, which more nearly approaches regularity or which was organized and conducted more in consonance with the principles of honesty and good faith which should govern men in the ordinary business relations.

We take it to be incontestable, under the evidence, that, according to the rules and customs of the Democratic party in this state, the county central committee of the Democratic party of this county, of which it has been found by the court that Maloney was chairman, had, in the absence of a surrender of that power, authority, through its chairman, to call a county convention and the primary elections for the selection of delegates thereto, and that, had not such authority been surrendered by the committee, its chairman is authorized to prepare a temporary roll call of delegates elected at the primaries and entitled to vote upon the question of the temporary or preliminary organization of the convention.

It may be said that the county central committee may not surrender this power, but for the purposes of this opin-

ion, assuming, but not deciding, that it might, let us inquire what, in fact, it purported to do.   It appears that both county central committees of the factions, each claiming to represent the Democratic party of the county, agreed to surrender to a so-called peace committee their power over and concerning the calling and holding of primary elections and the county convention.  At least, they agreed to appoint this committee and confer upon it this power to be exercised upon certain prescribed conditions.

Were it necessary, we should not hesitate to say that the resolution of the state convention held in June is not comprehensive enough to include the things which this peace committee assumed to do, but that is not important here.  It is sufficient to say that, whatever powers the peace committee had, it got from the rival factions themselves as a result of their voluntary agreement, and the limit, extent and nature of the powers which the committee possessed are evidenced and measured exclusively by the written agreement under which it was appointed, and in accordance with which it was required to act.

By the terms of this agreement, the returns of the election judges presiding at the primaries were to be made to a designated person, and were to be canvassed and a temporary roll call of the county convention made up by the peace committee proper, consisting of five members, with the addition thereto of Thomas J. Maloney as the sixth member, and this committee thus composed of six persons, had the power of a returning board.   That is to say, the returns were to be canvassed, and the roll call made up, by not less than four of the six members.   That this committee could act only by a majority vote is clear on principle, and such is the authority.  *Liggett v. Orr*, 25 Colo. 462.

It is uncontradicted that the roll call was not made up by the requisite majority of this committee, and that the alleged roll call prepared under the direction of Judge Adair Wilson,

as chairman, had no foundation in fact, and was in violation of the peace committee's agreement, and lacked its oauthorization.

The court in its findings has said that three of the members made up the roll; but while not of any particular consequence, yet, according to the evidence of Judge Wilson himself, its chairman, this roll call was not, so far as he knew, agreed upon by either of his colleagues, though it does appear that, by their conduct, two others acquiesced therein. Indeed, he himself never verified it. He ordered his secretary to prepare it on a certain principle, and he assumed that his instructions were observed, though he did not, as a fact, know that they were. It makes no difference, however, in the principle involved whether the roll call was made up by only one, or by three, members of the committee. In either case it was not authoritative or binding.

It needs no argument to show that this provision for the making of the roll call was plainly the most vital part of the agreement, for the roll call was the controlling thing, irrespective of the temporary officers of the convention. The delegates who might participate in the temporary organization and the selection of a committee on credentials, and whose votes would decide the various contests relating to membership, would be able absolutely to determine the complexion of the convention.

This agreement further provided that the convention should be called to order by Thomas J. Maloney as chairman of the county central committee. It may be said that this was not very essential, since the temporary officers were to be selected by three out of five members of the committee, and the roll call was to be prepared by a majority of the six. However this may be, the committee could not disregard one, and insist upon the binding force of another, part of the compact. So, when the attempt was made by Judge Wilson to organize this convention upon a temporary roll call pre-

pared in direct violation of the terms of the agreement under which only the peace committee had any power to act, no regularity attached to the convention thus brought into being, and the proceedings of such body cannot be said, in any proper sense, to represent the Democratic party.

It is only just to say that Judge Wilson, in his testimony does not pretend that his act was authorized, or that he possessed any power to organize the convention, or prepare a roll call of its members. He was not a delegate,—not even a voter in Arapahoe county. He did what, in the delicate and embarrassing circumstances, seemed to him was necessary to prevent a bolt or disruption of the county organization, trusting to the state convention to ratify his acts if the matter came before that body. Unfortunately, the state convention never had occasion to consider them, for no contesting delegations from Arapahoe county appeared.

It is further urged that Maloney's refusal to open the doors of the theater gave to any delegate power to call the convention to order. Maloney had the right to exclude from the meeting place those not holding proper credentials, and to prevent the assembling of a convention thereat other than the one called. But if he was wrong in not sooner opening the doors, that is not important, for after they were opened, the procedure leading up to the pretended organization in the hall was repeated in the theater.

With the terms of this agreement thus disregarded by the Speer faction, what then were the powers of the county central committee of which Maloney was chairman, and what the power of that chairman in and about the organization of a convention, whose delegates were elected and had assembled pursuant to his call? Certainly, as we have said, the Speer faction cannot insist upon the binding force of one provision of the agreement and disregard another, and when the Maloney faction discovered that the agreement in its

essential provision was disregarded by the rival faction, the county central committee of which Maloney was chairman had the right to resume and take unto itself the power which it had delegated to the peace committee to be exercised only in a certain way, and he, as the chairman, might reclaim the power which was his before the agreement was made.

But it may be said that this conclusion follows provided only the committee of which Maloney was chairman was the regular county central committee, and involves the assumption of the proposition in controversy. To this we reply that the court, in its findings, declared that Maloney was the chairman of the county central committee. This implies that the committee of which he was chairman was the regular committee; and if this is so, clearly the convention could be organized under its direction. If, however, such finding be not attended with this result, and if the agreement under which the peace committee acted was still in force after its palpable violation by the Speer faction, then, according to its very terms, Maloney had the right, as chairman of the county central committee under whose call the convention assembled, to call it to order, and would have that right, and be invested with the power, merely because he was chairman. Moreover, we have held in other cases, and it appears to be the practice of the Democratic party according to the uncontradicted evidence in the case, that the chairman, with power to call a convention to order, has the power to make up a temporary roll call which cannot be changed until such organization is perfected. But if we continue to assume that the peace committee's agreement was still effective, that part which provided for the making of the roll call was inoperative because of the inability of its members to agree. It must follow, in that event, that the roll call should be made by the officer who, in the absence of some valid agreement susceptible of enforcement otherwise providing, would possess such authority. Undoubtedly Maloney, the chairman

of the county central committee under whose call the delegates appeared, was that person. The temporary roll call, therefore, made up by him under the authority of the county central committee which he represented, was the only one that has any legal basis.

Let us pursue the argument a little further. ' If the peace committee, as the agent of the parties constituting it, had the authority to call and organize a county convention, as petitioners assert, it could do so only by observing the terms of the grant which was the source of its power, and when it failed or refused to be governed by that instrument the agreement was at an end, and the committee which, or person who, in the absence of a lawful agreement otherwise providing, had the power originally, became reinvested with it. Failing to comply with these conditions, the peace committee's authority ceased, and that authority might be resumed by those from whom it came. Certainly, if the county central committee could delegate to the peace committee authority to call and organize a convention, it could, if its agent were guilty of bad faith or palpably violated material regulations agreed upon, resume the power thus delegated.

It appears from the findings of the trial court that Maloney, as chairman of the committee, and as the officer making the call, called the convention to order upon the roll call which he himself had prepared, and that afterwards this temporary roll call was made the permanent one of the convention.

From the foregoing it would seem clear that the convention held at the Broadway theater and called to order by Maloney was the regular convention of the party, and its nominees entitled to a place on the official ballot.

2. It is said, however, by counsel, and authorities are cited in support of the contention, that a majority of the delegates duly elected to a convention constitute the regular convention, and are entitled to control its proceedings. In

this connection it is said that when Mr. Bottom assumed to adjourn the convention from the Broadway theater to the Coliseum hall a majority of the delegates repaired thither and participated in the convention there held; and therefore, irrespective of the irregularities that may have attended its organization upon a roll call made up in express violation of the terms of the agreement constituting the peace committee, the action of that convention should be stamped with regularity because a majority of the delegates participated.

In the first place, it is doubtful, as a general proposition, if the chairman of a convention has the power, without submitting the question to a vote of the convention itself, to adjourn it to some other place or time. If he does possess such arbitrary power, how completely a convention might be subject to the whim or caprice of its presiding officer! We pass that by, however, as not very important here, and remark that the assertion that a majority of the delegates duly elected participated in the Coliseum hall convention assumes the very proposition in question without proof in the record to support it.

It is probably true that a majority of those appearing upon the roll call as prepared by Judge Wilson did go to the Coliseum hall, but the fact that their names appeared thereupon is not even *prima facie* evidence of the validity of their claim to be delegates; and the fact that afterwards they organized themselves into a convention which conducted its proceedings at Coliseum hall, and which may have given seats to a majority of those whose names appeared upon that roll would not, in the absence of a contest by others claiming the right, be conclusive, or any, evidence thereof. It must be remembered, also, that the election of a large number, if not a majority, of those who sat as delegates in Coliseum hall, was contested and protests duly filed by the Maloney faction, upon the grounds, *inter alia*, that the rules for conducting the primaries were violated by the

Speer faction. These rules provided that only a certain kind of paper should be used for ballots, and that the police of Denver, supposed to be friendly to the Speer faction, and the sheriff's officers, partisans of Maloney, should not take part in the election. That both regulations were violated by the Speer faction is clear. It is not true, therefore, that a majority of those entitled to participate in the temporary organization of the convention left with the Speer faction, and the mere fact that a majority of those *claiming* to be delegates may have participated in the Coliseum hall convention is not sufficient to take from the Broadway theater convention the distinction of regularity arising from its proper organization. This court has held that where a convention has been duly called to order by the person having the power to do so, and the convention has been organized by him, such a convention is the regular one, though a majority of those elected delegates to it may not participate therein. *Whipple v. Broad, supra.*

3. It is further said that if the Maloney convention was at one time regular, it is so no longer by reason of certain acts of those who participated in it, and that thereby the Broadway convention itself is estopped to assert that regularity, and its nominees are estopped to insist upon the claim of being the regular nominees of the party. As stated by counsel, the contention is that this estoppel arises because the members of the Coliseum meeting were led to believe that the Broadway convention would not nominate a ticket, and this belief was brought about by the fact that the Broadway convention adjourned, and thereafter all its members took part in the rival convention; that a committee of the Broadway convention, with power either to ratify the action of the Coliseum convention, or to take such action as it saw fit, participated in the rival convention; that while the Coliseum convention was adjourned from the 7th to the 19th of September, the Broadway convention took no action in the

meantime, and when the Coliseum convention finally adjourned, about the 20th of September, the Broadway convention did not reconvene until the 27th, and that the latter, as a convention, did not nominate any candidate for office, though it pretended to do so by a committee, which the statute sanctions. Its silence and apparent acquiescence in the action of the Coliseum convention, it is said, induced the state convention of the party to recognize the regularity and due organization of the Coliseum convention.

There are several conclusive answers to this contention. Under the facts, this is not a controversy to which the state organization is a party, or in which its voice is authoritative. We have held that, in the absence of a contest before it, the decision of a state convention in admitting delegates from a convention of a subordinate division of the party is not decisive of anything, but that the regularity of the convention of the subordinate division is to be determined irrespective of such action of the state convention. *Twombly v. Smith*, 25 Colo. 425.

And if the different divisions are thus independent, the Maloney faction might approve of what the other did in so far as concerns the sending of delegates to the state convention, and reserve to itself the right to nominate tickets in the divisions of the party known as the county and judicial district. Maloney testifies that the Broadway convention refrained from sending delegates to the state convention in the interests of party harmony. Having tried to have the June convention determine the factional fight, with the result that that body refused to do so, this wing of the party was strictly within its legal right when it submitted to the county the adjustment of the controversy that had divided the local party into two contending factions.

The writer of this opinion did not concur in the Twombly decision, but, as he has had occasion heretofore to say, he believes that the doctrine *stare decisis* is particular applica-

ble in controversies of a political nature, and does not believe that the principles of a decision on such a controversy pronounced at one election should be changed when similar conditions prevail at a succeeding election. If the doctrine was good then, it is good now, and should be enforced, and whatever may have been his opinion once, now that this court has ruled against him, he is not disposed in cases like this to upset previous well considered decisions.

The action of delegates of a convention, acting in their individual capacity, in taking part in a rival convention, will not bind the convention itself. As a matter of fact, delegates who recognized the Broadway convention, and thareafter entered the Coliseum convention, did so protesting that they did not recognize the regularity or legality of the latter. But what is more to the point, there is no proof, although the assertion is made, that the Broadway convention, as organized by Maloney, dissolved or disbanded and went in a body to the Coliseum hall convention, or that more than a few members, much less than a majority, ever attended its meetings. On the contrary, when the Broadway body did adjourn on the day when it was regularly called to meet, it did so, not finally, but subject to the call of its chairman, and before such adjournment appointed a committee with power to ratify the actions of the Coliseum hall convention or to take such action as it saw fit. This was notice of an emphatic kind to the Coliseum convention that the Broadway convention asserted its regularity, and did not intend by that act to abrogate its power, or acquiesce in the proceedings of the Coliseum hall convention.

The Broadway convention afterwards did duly assemble, in pursuance of previous authority, and appointed a committee to make nominations, which action was in accordance with an express provision of the statute. Even if, on the day of original meeting, it had surrendered its power to make nominations to the committee which it appointed before it

adjourned, that committee, instead of ratifying or approving of the action of the Coliseum hall convention, did not see fit to exercise the power at all, but reported to its principal (the convention) on the day of its reassembling that it would not take to itself that responsibility, and thereupon the convention resumed the power previously delegated and afterwards conferred it on a new committee which proceeded to act. So that, as already held by this court in another case, even if the Broadway convention on the day of its original meeting, had expressly approved of the action of the Coliseum convention, and had expressly ratified all its acts, still, by further providing for a subsequent meeting at the call of its chairman, it thereby reserved to itself the power to repudiate that action, and might thereafter altogether rescind its former doings.   When it provided for adjournment, this carried with it notice to all the world that the convention at its adjourned meeting might undo all that was done at its first. meeting, and at this adjourned meeting other and entirely different action might lawfully be taken.   *Phillips v. Smith,* 25 Colo. 398.

But, in addition to all this, it is well settled that there can be no estoppel unless the party asserting it has been injured, or has done something, or omitted to do something, which he would not have done, or omitted to do, had it not been for the inequitable conduct of which complaint is made.   There is not any evidence in this case, nor was there any such claim in argument, that the Coliseum hall convention did anything different from what it would have done had it not been for the action of the Broadway convention.   On the contrary, those claiming to be delegates who left the Broadway theater and went to the Coliseum hall, went there for the express purpose of electing delegates to a state convention, which was done, and thereafter at an adjourned meeting met for the avowed purpose (which was accomplished) of nominating a county and judicial ticket.   So far from a claim being

made that a course was pursued different from that which would have been taken had it not been for the alleged inequitable conduct of the Broadway convention, the very contrary appears. That is to say, the very thing was done by the Coliseum hall convention which the delegates sitting therein intended to accomplish when they left the Broadway theater. There is no claim, nor is there any proof, that, so far as the county and judicial tickets are concerned, had the Coliseum hall convention supposed that the Broadway convention was intending to nominate a ticket, the former would not have nominated a ticket, or that it would not have nominated the very persons whose names appear upon their certificates.

Our conclusion is that the Broadway theater convention was the regular convention of the Democratic party in this county, that it retained that regularity throughout its proceedings, and that the convention, as such, not only did not abrogate its power, or by reason of its actions surrender to the Coliseum hall convention its prerogatives, but that it expressly, both by conduct and resolution, declared to all who were interested in its proceedings, its paramount right of being the regular Democratic convention, and the Coliseum hall convention was duly apprised of that claim, and was not in any respect misled or injured by its acts.

It follows that the judgment of the district court should be set aside, and judgment will be entered here ordering the county clerk not to print upon the official ballot the ticket nominated by the Coliseum hall convention as the ticket of the Democratic party, or its nominees, but he is hereby ordered to print upon such ballot, as the nominees of the Democratic party, of this county and the second judicial district, the list of nominees heretofore certified to him as the nominees of the Broadway convention. The parties are to pay their own costs in this court, and in the court below the costs are to be taxed to the petitioner here.

*Judgment reversed.*

Mr. JUSTICE GODDARD not participating.