No. 10,921.

THE PEOPLE EX REL. VICK ROY *v.* REPUBLICAN STATE CENTRAL COMMITTEE.

Decided April 7, 1924. Rehearing Denied May 5, 1924.

Action in mandamus to compel the recognition of relator

as a member of the Republican state central committee. Writ discharged.

## Reversed.

1.  ELECTIONS—*Political Organizations—Jurisdiction of Courts.* Under the provisions of section 7556, C. L. '21, relating to elections, it is held that the district court has jurisdiction to order the recognition, by a state central committee, of one, who under the pleadings, is admittedly a member of that body.

*Error to the District Court of the City and County of Denver, Hon. Julian H. Moore, Judge.*

Mr. N. WALTER DIXON, Mr. WILLIAM H. DICKSON, Mr. WILLIAM R. EATON, for plaintiff in error.

Mr. PAUL W. LEE, Mr. C. C. DORSEY, Messrs. HODGES, WILSON & ROGERS, for defendants in error.

*En banc.*

MR. JUSTICE DENISON delivered the opinion of the court.

THE relator brought mandamus to compel the respondents to recognize him as a member of the state central committee. The court sustained a demurrer to the petition and discharged the alternative writ.  He brings error.

The question argued in the briefs and at the bar is whether the district court has jurisdiction to order relator's recognition.  It would seem that upon this record it has such power.

The act of 1910, § 25, C. L. § 7556, provides, Whenever it shall appear to any judge that any wrongful act has been performed by any person charged with a duty under this act, or that any neglect of duty has occurred, such judge shall require the person charged with the wrongful act to correct it or show cause why not.

It is evident that the wrongful act or neglect here mentioned must be one relating to the duty with which the person is charged and that the court has power to compel any person to correct any violation of any duty with which he is charged under the act.

If, then, the state committee has violated a duty with which it is charged under the act, the court has power to direct it to correct the wrong.

By section 21 of the act, C. L. § 7552: "The chairman and vice-chairman of the several party county committees shall constitute the state central committee of each  *  *  * party."

It is a duty, then, of the state committee to recognize the county chairman as one of its members and that duty is charged upon it by the act.   The record before us admits, by demurrer, that the relator is county chairman.   On the record, then, the court has jurisdiction to require and must require his recognition as a member of the state committee. If the answer should deny that the relator is chairman perhaps other questions would arise.

I cannot concur in the opinion of the Chief Justice.

Judgment reversed.

MR. JUSTICE ALLEN and MR. JUSTICE CAMPBELL dissent.

MR. JUSTICE BURKE not participating.

MR. CHIEF JUSTICE TELLER specially concurring:

I agree with the conclusion stated in the opinion of Mr. Justice Denison that the court is given jurisdiction of this case by section 25 of the election law of 1910.

I am further of the opinion that the court had jurisdiction regardless of that section.   The relator claims that he is, by virtue of an election held under the primary election law of 1910, and by subsequent proceedings thereunder, a member of the state central committee of his party, and that said committee declines to recognize his membership.   He seeks by mandamus to compel the committee to restore him to the position from which he has been unlawfully excluded.   He claims a statutory right, and I can see no reason why he may not invoke the aid of the courts to protect that right.

A similar question was before the New York Court of Appeals in 1900, and is reported under the title of *People*

*ex rel. Coffey v. Democratic Committee,* 164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 674. A very able opinion in that case, by the then Chief Justice Parker, vindicates the rights of the relator above stated, clearly and, as I think, beyond question. It is there pointed out that the primary election law was intended to and did take from political bosses the right to control in the nominating of candidates for office; that it had surrounded the primary election with all the safeguards provided for general elections; and that the persons who are chosen by the voters to represent them, in matters preliminary to nominations, are entitled to hold the position for which they have been so chosen during the term prescribed by law. It is there very aptly said: "The scheme is to permit the voters to construct the organization from the bottom upwards, instead of permitting leaders to construct it from the top downwards."

Referring to the claim that a general committee of a political party ought to have the right to remove a member from office, the court said that the legislature appeared to have "decided that the wrongs that had been and were being done to the primary voters exceeded that which could result from occasional association with a hostile member. In other words, it determined that the majority of the primary voters were entitled to select any representative that they might desire, who should be responsible to those electing him, and only to them, for his conduct in office."

It was therefore held that the relator was entitled to a writ of mandamus to compel the central committee to restore him to the privileges of membership.

Our law of 1910 gives practically the same protection and endorsement to the primary election law as does the law of New York, to which the court had reference. It puts primary elections upon the same plane as elections to office; provides voting booths, election clerks and judges and certificates of election, all at the expense of the taxpayers. To say that a man chosen to a position named in the statute may be ousted from that position by a political committee, without a reason other than political, and have

no remedy in court, is to say that the law, passed at the demand of the people to remedy that very abuse, is without effect. It is a charge that the legislature authorized the expenditure of public money without expectation of any substantial benefit therefrom.

A similar question was before the supreme court of Missouri in *State, ex rel. Guion v. Miles, et al.,* 210 Mo. 127, 109 S. W. 595. There the relator sought, by mandamus, to compel the Democratic central committee of St. Louis to restore him to membership on that committee. He had been elected a member of the committee by direct vote at the primary election, but had been expelled from the committee for an alleged failure to comply with one of its rules as to meetings. His right to the writ was first challenged, and the court held that mandamus was the proper remedy. The court quoted with approval the New York case, and held that the right of legislative bodies to determine the qualifications of their members afforded no support to the action of the committee, the right exercised by legislative bodies being constitutional. The court points out that if the general committee, provided for by the primary act, has power to make rules by which a member may be expelled, it may be said that the legislature has enacted a meaningless provision when it provided that committeemen should be selected by the people at the primary election in their respective wards. Evidently this is so, because if a committee may deprive one of its members of his right to sit and act with them, it may also deprive other members, and so become in effect a voluntary body, such as existed before the primary law was passed.

I am clearly of the opinion that the law of 1910 repealed so much of the law of 1901 (section 7811, C. L. 1921) as recognizes the right of a voluntary state central committee to determine controversies arising from claims to positions created or recognized by the later law in the section now appearing as section 7552, C. L. 1921. The law of 1910 covers the whole subject fully, and provides for the exercise of all the authority by the elected committee which

the act of 1901 conferred. upon the voluntary committee. A considerable portion of that section covers the same subject which is covered by the election law, including the manner in which the central committee is constituted.

The provisions here relied upon by the relator are plain, unambiguous and comprehensive. His right, therefore, to a hearing by the court cannot be denied upon any doubtful question of the effect of a prior statute, which is at least apparently repealed.

I am authorized to state that Judge Whitford and Judge Sheafor concur in these views.

MR. JUSTICE CAMPBELL dissenting:

This is a mandamus proceeding by the relator Vick Roy to compel the Republican state central committee of Colorado to recognize him as a member of that body by virtue of his chairmanship of the Republican county central committee of Denver, the holding of which, under the primary election statute, he says makes him a member of the state committee. The alternative writ, like the petition, does allege that relator is county chairman duly elected, and recognized as such, by the county committee. There are other allegations therein which, though perhaps not well pleaded, may tend to show at least an attempt by the state committee to remove relator as county chairman and that there is a rival claimant. Counsel of both parties below and here, as well as the district court at the trial there, apparently have proceeded on the theory that the alternative writ sets forth a real controversy in the Republican party of this state and between its state committee and the Denver county chairman, and the district court dismissed the proceeding for lack of jurisdiction to settle such party disputes. This court, however, is not bound by the construction of the litigants or trial courts as to what questions of fact and law are for its determination in any case. This court makes that determination for itself and so here the majority opinion of Mr. Justice Denison, probably considering these other allegations referred to

of no value as stating facts, says that the respondent state committee, by its demurrer to the alternative writ, admits that relator is county chairman. My construction of the alternative writ inclines me, as at present advised, to the opinion that it was possibly the intention of the relator to tender for decision the question of the jurisdiction of the courts to pass upon political party controversies or wranglings of this nature between its members or rival place holders or claimants. I do not say that such was the purpose of relator. The majority of this court, however, has spoken and it has said in effect that whatever may have been the intention, the respondents have, upon the record now before us, admitted that relator is county chairman, which admission, of course, necessarily implies that there is no political controversy, or any controversy of fact, involved in this record, because the very vital and controlling thing upon which the relator relies and alleges in the alternative writ is admitted by the respondents. It would seem, therefore, since there is no party or other dispute of fact here presented, and relator's title is not questioned, if the place or office he holds, and his holding, are such as to bring them within the class of cases which mandamus protects, the writ should go, if at all, on the authority of our Code of Civil Procedure, wholly without reference to the primary election statute.

The majority opinion is necessarily restricted in its scope and bearing to the facts as they appear in the present record. Not only is this the general rule but the opinion itself, with the caution characteristic of its author, leaves no doubt about it. It closes with these significant words: "On the record, then, the court has jurisdiction to require and must require his recognition as a member of the state committee. If the answer should deny that the relator is chairman perhaps other questions would arise."

The majority evidently think, and so declare, not by demurrer, but by answer if at all, should questions of disputed title be raised as no dispute is averred in this writ. If, therefore, upon a remand, which is ordered, an answer

is filed which denies title or by affirmative defense states a controversy, then the important questions suggested in the opinion would arise.

This dissenting opinion would conclude here were it not that the majority opinion finds authority in section 25 of the primary election statute, S. L. 1910, Chap. 4, p. 33; C. L. 1921, Sec. 7556, for issuing the writ in this case, where no question of title is in issue, though it does not purport to say that where there is a real controversy of a party nature over title the writ would or could go. I think, with all due deference to my brethren, that such a pronouncement now is premature and unnecessary and contrary to usual practice. The power of the court to issue the writ, if it exists at all, can be traced to, and is to be derived from, our procedure code in such a case as is now before us where there is no dispute about the title. Of course the majority opinion is to be read in the light of the facts of the case before us, where no controversy to title exists. What the rule should be, or whether courts have the power to determine purely political controversies by mandamus or otherwise, should not be decided in advance of a case that squarely presents the question. *Speer v. People,* 52 Colo. 325, 345, 122 Pac. 768. Particularly should this practice be observed in a case like this. The general doctrine is that the ordinary method for determining the title to office and for securing possession of it, and with us the only method, is an information in the nature of quo warranto or its substitute. 29 Cyc. p. 1416. In *Grant v. Elder,* 64 Colo. 104, 170 Pac. 198, are vigorous majority and dissenting opinions and a wide range of discussion upon the appropriate methods. The majority opinion, which is now the law of this state, says quo warranto is the sole method; the dissenting opinion by the present Chief Justice held that in some cases, like the one there, no legal remedy, either quo warranto or mandamus—which are, of course, extraordinary legal remedies—but only a suit in equity afforded adequate and complete relief. If then, on a remand an answer, properly presenting a political party dispute, is

filed and the title of relator questioned, mandamus, and that is the present proceeding, is not the method for trying the issue. The Grant-Elder opinions both so declare. It should be stated here that the only decision in this cause is what the majority opinion of Justice Denison announces. It is concurred in by four of the six participating judges. In the opinion of the Chief Justice only three of the six concur, the other three dissenting. As to matters therein disposed of, the court being evenly divided, the decision of the trial court stands. *Speer v. People, supra.* This observation is pertinent here and is made in advance of any separate discussion of the concurring opinion.

Resuming now further consideration of Justice Denison's opinion. Reproduction of section 25 in its entirety will be helpful, for the excerpts therefrom in the opinion do not fully or sufficiently disclose what its real object is. It reads as follows:

"Sec. 25. Whenever it shall appear by verified petition to any judge of the District Court that any error or omission has occurred, or is about to occur, in the printing of the name of any candidate on official direct primary election ballots, or that any error has been or is about to be committed in printing such ballots, or that the name of any person has been or is about to be wrongfully placed upon such ballots, or that any wrongful act has been performed or is about to be performed by any judge or clerk of the direct primary election, or by the Secretary of State, or by the county or city or municipal clerk, or by any canvassing board or any member thereof, or by any person charged with a duty under this act, or that any neglect of duty by any of the persons aforesaid has occurred, or is about to occur, such judge shall forthwith, by order, require the officer or person or persons charged with the error, wrongful act or neglect, to forthwith correct the error, desist from the wrongful act, or perform the duty, and to do as the court shall order, or to show cause forthwith why such error should not be corrected, wrongful act desisted from, or such duty or order not performed. Pro-

vided, that the person or persons, committee or committees complaining of any such act, shall have the burden of proof cast upon him or them in the premises, and shall be required to deposit in court the sum of two dollars ($2.00) per day for each person so cited or summoned into court, as a party or as a witness, to be paid to the said party or witness in case the charge is not sustained, said money so deposited shall be returned to the party depositing the same in case the said charges or any of them are sustained. Failing to obey the order of such court shall be contempt of court. Every such order shall be subject to summary review by the Supreme Court upon writ of error."

In September, 1922, this relator, then represented by two of the learned counsel who appear for him here, was a defendant in an equity suit similar in its facts to this, where he took a contrary position to that which he takes here. Neither in that case nor here, in written briefs or oral argments on final hearing, directly or remotely was this section referred to or relied upon as conferring upon the courts jurisdiction of political party controversies. Two years ago, of course, it was not in the interests of relator to find authority for such jurisdiction. In the instant case it is vital to his interests that his counsel should be able to put their finger on some provision of this primary election statute or some other statute which authorizes or pretends to authorize interference by the courts with purely political questions of this nature. All who know these learned lawyers recognize their resourcefulness, their ability and skill and industry and know that no section of this or any other statute has escaped their watchful eye, and if they have anywhere discovered any such statutory authority it has not been divulged to us, either in their written briefs or oral arguments in court. This in itself is not conclusive that section 25 contains no such investiture of power in the courts, but it should be persuasive with us that it does not. There are several reasons why this section has no application whatever to such a controversy as is now before us. In *Britton v. Board*

*of Com'rs,* 129 Cal. 337, 61 Pac. 1115, 51 L. R. A. 115, cited approvingly in *City of Sonora v. Curtin,* 137 Cal. 583, 70 Pac. 674, and *Schostag v. Cator,* 151 Cal. 600, 91 Pac. 502, and later cases, it was held that a primary election law which attempted to take away from a political party its inherent rights of self-control and self-preservation, was unconstitutional and destructive of the fundamental rights growing out of the nature of free government in this country. In the opinion *Calder v. Bull,* 3 Dall. 386, 1 L. Ed. 684, is cited with approval, in which the Supreme Court of the United States held that an act of a state Legislature contrary to the great first principles of the social compact can not be considered a rightful exercise of legislative authority. The Britton opinion also refers with approval to *Whipple v. Broad,* 25 Colo. 407, 55 Pac. 172, in which this court said: "Self-preservation is an inherent right of political parties, as well as of individuals." The Britton case was vigorously contested by eminent counsel on both sides of national reputation and the opinion was by Henshaw, Justice, one of the able judges of that court. A similar objection is pointed out by Judge Cullen hereinafter copied.

There is another and a constitutional reason, if section 25 has the meaning and effect attributed to it in the majority opinion, that would make it repugnant to section 21 of article V of our state Constitution which says that no bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in the title; but if any subject shall be embraced in any act which is not expressed in the title, the act is void as to the part not so expressed. Let us apply that rule to this statute. The general assembly knew of this constitutional provision and it is not to be presumed that it intended to, or did, violate it. There is nothing in the entire primary election act, unless it be section 25, which even purports to give to the courts jurisdiction of factional or other party controversies, but if it has done so, as already stated, any such provision would be invalid. The

principal subject of the act is primary elections and as incidental to, and a part thereof, is the regulation for the government of political parties and political organizations. Only such regulations of political parties would be germane to the title as directly bear upon the holding and conducting of primary elections, canvassing the vote, preparing ballots and making nominations for political office. Any regulation that would have for its object the control of a political party concerning its own internal affairs or its own right of self-control and self-preservation, as an organization, would not be included in the title; and, if it was, then the act would contain two distinct subjects; one, primary elections, the other, regulation of voluntary organizations in matters that in no wise tend to the purity and integrity of primary elections or nominations. I say that there was no such purpose on the part of the general assembly. It is significant that there is no provision purporting to confer such judicial power. The only other section of the act mentioning courts is section 44 and it relates to contests over the results of an election, and the placing in nomination by petitions in behalf of candidates for office.

We come now to an analysis of the provisions of section 25, which the majority opinion says is authority for the courts to issue a writ of mandamus. We again advert to the fact that this declaration is to be taken in connection with the facts of this case, where there is no dispute of a party nature; and it has not yet been decided that this section gives to the courts power to determine a controversy between rival claimants of the office or place of a county chairman where that title is in dispute. The object in giving my views as to the meaning of this section is to prevent any misapprehension as to the effect of the majority opinion. To what does section 25 apply? When is the district court or judge required to act thereunder? By the express language of the section the power of the court or judge may be invoked only when by a verified petition it is alleged that an omission or error has occurred

or is about to occur in the printing of names of candidates on official primary election ballots; or when error or omission has occurred ·or will occur in printing such ballots; or that some name has been, or is about to be, wrongfully placed upon such ballots; or that some wrongful act has been performed, or is about to be performed, by any judge or clerk of a direct primary election, or by the secretary of state, or by the county or city or municipal clerk, or by any canvassing board or any member thereof, or by any person charged with a duty under this act, or that any neglect of duty by any of the aforesaid persons has occurred, or is about to occur, then, and then only, shall the judge order the persons named either to desist from the wrongful, or to perform the lawful, act. The act manifestly is directed to acts of persons who hold public office and who are charged with the duty of preparing and printing ballots, conducting primary elections and canvassing the returns. The phrase: "or by any person charged with a duty under this act" means, and only means, some person employed by, or connected with, and whose duty concerns, these public election officers in doing the specified things devolved upon them. It is quite clear that its purpose was to include all public employees or officials not theretofore in the section specifically named but who have "a duty" to perform in connection with the primary election. The entire section concerns only matters and affairs of public officers and public employees and can not be rightfully extended to include the officers or members of a political party committee or the committee itself who have nothing whatever to do with any of the matters or things mentioned or provided for in section 25. Any duty or function under this act that party committees have in connection with primary elections, precedes the printing and preparation of election ballots and the conduct of the primary election and the canvass of the vote. It would, therefore, be an unwarrantable construction to say that this section gives authority to a court or to a judge to interfere with, or pass upon, matters or duties which concern solely

the integrity and preservation and the very existence of a political party and which have no connection whatever with the subject matter of section 25. Suppose the state central committee or its chairman, or both, were cited to respond to the verified petition that alleges that some special act or omission or error as to election ballots, etc., had occurred, or was about to occur. Can the court require them to refrain from doing, or compel them to do, any of the things complained of? Would the fact that the committee or chairman, or both, are charged by some other section of the act with duties of a different character and that are not imposed by section 25, authorize the court to compel them, not public officers at all, to do or refrain from doing certain things pertaining to party government? This illustration shows the inapplicability of section 25 to party controversies.

Then, too, we are without knowledge of the attitude of counsel of either party to this litigation as to the bearing of section 25. The question has been raised by the court itself and, in such circumstances, there is always more or less danger of deciding such important matters without assistance of counsel. This to my mind is an additional and a strong reason for not giving definite expression of opinion upon such a matter when it is not necessary to a decision of the case but is only pertinent in anticipation of some possible issue that may, or may not, be presented. Definite decision should be withheld until the appropriate time. As already stated, I realize that the court has really passed only upon questions of pleading, and upon the state of facts in the record as it now is, and has not even purported to say that section 25 confers jurisdiction upon the courts to determine purely party controversies. I am persuaded that upon argument by respective counsel and further investigation by the court, the expression of opinion as to the bearing and effect of section 25 would be suspended until a state of facts before the court requires a decision, and in that event a different construction would be put upon the section.

2. The concurring opinion of the Chief Justice, in which two of his associates join, settles nothing in this case and is not binding for the reasons hereinabove given. Aside from its own reasoning it is based on the Coffey case from New York and the Guion case from Missouri. The decisions in both cases were by divided courts. In the Coffey case four judges said that the general committee of a political party has not the power to remove one of its members for any reason or upon any pretext whatever because under the primary election law a member is elected at a state primary by the voters of the entire party for a definite term. Three judges dissented. In the Missouri case it was a 4 to 2 decision in favor of the power of the courts. The Missouri statute was copied from that of New York and it was largely for this reason that the New York decision was followed. The majority opinion in the Coffey case was written by Chief Justice Parker, an eminent and distinguished judge. The minority opinion was by Judge Cullen, equally eminent and by lawyers generally considered one of the ablest judges in the country. If it were necessary, differences in various particulars between the New York primary election act and ours could be pointed out that would make the New York majority opinion inapplicable under our statute. One vital distinction peculiarly pertinent, and of itself controlling, is that though the New York act permits the general committee of the party to make rules and regulations, it specifically requires that they shall be consistent with the statute law. Having held that the statute by implication was inconsistent with party regulation this restriction was held valid and the power of the committee denied. In his opinion Judge Parker says that were it not for this limitation on the power of the committee to make rules, there might be ground for controversy that the committee and not the courts might remove one of its members elected at a statutory primary election for treachery to the party or for any good reason. But the court said that because the member is elected by the entire membership of the party at a regular election, this

by exclusion takes from the committee itself the power of a-motion. Let it be emphasized that the Coffey decision that a party committee cannot remove a member elected by the entire party, is predicated upon such election only. That is not the kind of a case we have here. The relator was not elected by the party at a primary election. He was appointed by the central committee and the committee might go outside its own membership in choosing its chairman. The reasoning of the opinion does not apply to a chairman who is not elected at a state or county election but who is appointed by members who are elected. The general rule everywhere in voluntary associations like a political party or private or quasi public corporations or joint stock company is that the same body that appoints can remove an officer like a chairman. This court has applied the rule to political parties. *Twombly v. Smith,* 25 Colo. 425, 427, 55 Pac. 254. There is nothing in our primary law, nor is there anything in the New York statute, that prevents a committee from removing its own appointee at its will. But if there is in the New York statute such a prohibition, there is none such in ours. Section 21 of our act reads: "The State Central Committee shall have power to make all rules for party government." There is no restriction or qualification here like that of the New York act upon the exclusive power of the committee to make such rules. If the state committee has this unrestricted power to make rules for party government, as both the statutes of 1901 and 1910 say it has, certainly by necessary construction it may by rule provide for and remove any one appointed as a chairman of any committee. This difference between the Colorado and the New York statute as indicated by the majority opinion in the Coffey case renders it inapplicable here.

It is not inappropriate here to reproduce what Judge Cullen said on this subject and it may well be read in connection with the excerpts from Judge Parker's opinion copied in the concurring opinion here. "The sole question, therefore, necessary to be discussed on this appeal is

whether there is power in the general committee of a political party to expel a member for misconduct in the member's duty to the committee, disloyalty or other cause." After stating that the power of a-motion or removal of members of an ordinary corporation or voluntary association is vested in the same body or committee that makes the appointment, as hereinbefore already stated, the judge continues:

"Why should not the same rule apply to the general committee of a political party? The members of that committee are certainly not public officers, for this reason, if for no other; public officers must, under the Constitution, be either appointed or elected, and if elected, then in the same manner as other elections by the people.  *  *  * They take no official oath. They cannot be indicted and removed for misconduct in office. It is difficult to imagine a case where the obligation of the member to the association is more purely ethical or more devoid of any legal attributes possible to be enforced by the courts. The political convictions of a member may change subsequent to his election and he may conscientiously desire the defeat of the party to which he has belonged. He may think that in no way can he accomplish that result more effectually than by remaining as a leader to share in the counsels and control of the party. Is the committee to be relegated to the chance of the member's sense of delicacy dictating his resignation, as the sole means of severing its connection with him? Is a county committee of the Prohibition party to be denied the right to exclude from its counsels a member who, subsequent to his election, engages in the manufacture or sale of intoxicating liquors, or has so little regard for his political principles as not to remain sober for a week at a time?"

Then referring to the argument of the majority that the organization and control of a political party are no longer matters of voluntary agreement among its members, but that under the statute relating to primary elections,

such power is elsewhere vested, the learned judge thus continues:

"From this doctrine I dissent *toto coelo*. If the statute is to be so construed, in my judgment, it is unconstitutional and void. The right of the electors to organize and associate themselves for the purpose of choosing public officers is as absolute and beyond legislative control as their right to associate for the purpose of business or social intercourse or recreation. The legislature may, doubtless, forbid fraud, corruption, intimidation or other crimes in political organizations the same as in business associations, but beyond this it cannot go."

Then in answer to the argument of the majority that evils have grown up in the management of political parties, complaints of dictation exercised by political leaders were common, and the statute was intended to secure to all citizens equal rights in the management of parties, Judge Cullen said:

"But an alliance cannot be made by one person alone. It requires the action of several whose rights are equal; no one can ally himself with others solely by his volition. Therefore, I do not see that an elector has any greater right to join a party unless on the conditions that the party prescribes, than he has to insist upon entering a partnership on contributing his quota of capital, against the wish of the parties then conducting the business."

In *State, ex rel. Smith v. County Court,* 78 W. Va. 168, 88 S. E. 662, as reported in 20 A. L. R. p. 1030, the annotator assembles many decisions with copious and instructive notes. The decisions from many states are collected and the majority are in harmony with the views of Judge Cullen in the Coffey case. The Colorado decisions are commented upon at length and the annotations show clearly that up to the present time our later decisions deny jurisdiction in the courts to determine party disputes.

In a recent case, *In Re Ganley,* 154 N. Y. Supp. 773, it was held that a chairman of a county committee appointed by the general committee, whose members were elected at

a primary election by the voters of the party, could be removed by the committee who made the appointment, and the courts are without jurisdiction in the premises. True, this was a decision by an intermediate appellate court. The opinion, however, cites the previous Coffey case of the Court of Appeals and holds it is inapplicable to, and is to be distinguished from, the case in hand because the county chairman there, as in the instant case, was not elected by the voters at large but by the members of a committee who were so elected. The entire opinion is instructive and is clearly against the position assumed here by the relator. In *Kearns v. Howley,* 188 Pa. 116, 41 Atl. 273, 42 L. R. A. 235, 68 Am. St. Rep. 852—Pennsylvania, like Colorado, having a rigorous primary election law—it was held that the courts have no jurisdiction to restrain the chairman of a county committee of a political party from filling vacancies in violation of the rules of the party, where it appears that no property rights are involved. At page 121 the court declares what is very pertinent here. It says:

"The constitution and statutes of the commonwealth guarantee to all citizens the right of self-government by protecting them in the exercise of the elective franchise for all officers voted for at state and local elections; and lately, the law has gone further, (referring to their primary election law), and has so far recognized political parties as to pass an act prescribing the duties of officers at primary elections, and imposing severe penalties for misconduct. But beyond this, political parties and party government are unknown to the law; they must govern themselves by party law. The courts cannot step in to compose party wrangles, or to settle factional strife. If they attempt it, it may well be doubted whether they would have much time for anything else."

The citizens of Colorado, of different political faiths, out of an unfortunate experience can bear testimony in support of this statement of the Pennsylvania court. This brings me to a consideration of the previous decisions of this court on such questions.

It is not an unnatural inquiry to ask why the Chief Justice has gone to other states for decisions on dissimilar statutes which deny to political parties the right of self-government by party law, when our own court has so emphatically denied that the courts of this state have any jurisdiction to determine party disputes and thus to take away the constitutional and statutory rights of its citizens of self-government in protecting themselves in the exercise of the elective franchise through political parties. In *People v. District Court,* 18 Colo. 26, 31 Pac. 339, and *People, ex rel. v. McGaffey,* 23 Colo. 156, 46 Pac. 930, the court said that prior to the year 1897, under the Australian Ballot Act, which purported to convey far more power upon the courts than does the primary election statute, the courts of this state were not clothed with power to determine which of two rival factions or party organizations was entitled to act for a political party. In *Spencer v. Maloney,* 28 Colo. 38, 62 Pac. 850, it was said that the Australian Ballot Act was amended in 1897 and thereunder this court, notwithstanding the previous cases were not overruled, and never have been overruled, did assume jurisdiction to settle a party dispute. The reason that this was done was because the parties before the court did not question its jurisdiction but urged the court to settle the controversy. In *People, ex rel. Lowry v. District Court, et al.,* 32 Colo. 15, 74 Pac. 896, in what is commonly known as the Lowry case, this court, referring to the Spencer case said that there was an intimation in the opinion there that the judiciary ought not to be clothed with, or exercise, power of this kind. Evidently acting upon this suggestion, our General Assembly in 1901, S. L. 1901, p. 169, passed an act conferring upon the state central committee of political parties full power to pass upon and determine all controversies concerning the regularity of their organizations in the state and the right to the use of the party name, and empowered it to "make such rules governing the method of passing upon and determining such controversies as it may deem best". This court said in the Lowry

case, which was a controversy between two rival county committees of the Republican party of Denver, each claiming to be the legal committee, that the sole tribunal for settling party disputes of every kind was the state central committee of the party and that the courts had no jurisdiction whatever to determine the same or to pass upon the decisions of the state central committee. The opinion thus ended:

"We close the discussion by saying that the general assembly exhibited wisdom and a regard for the interests of the judiciary in passing this statute by which members of the same political body are required to submit their controversies to the highest constituted authority of the party in the state. It relieves the courts of a class of litigation which should never be imposed on them, and confers the power, and places the responsibility for its exercise, upon the political parties, where it properly belongs."

This statute of 1901 was in force and presumptively was within the knowledge of our General Assembly when the primary election act of 1910 was passed. The General Assembly is also presumed to know of the decision of this court in the Lowry case that the 1901 act conferred upon the highest authority or body of the party full power to settle all party disputes. In the 1910 act there is no repeal of the 1901 act. There is no express delegation of power in the 1910 act to the courts to pass upon party disputes. The only regulation therein as to political parties applies solely to primary elections themselves and there is not an intimation or an indication in the entire act that the General Assembly intended to repeal the 1901 act or to confer upon the courts the power which the former act had lodged with the state central committee of a political party in the settlement of party disputes. Repeals by implication are not favored. This court held in *Harrington v. Harrington,* 58 Colo. 154, 144 Pac. 20, as stated in the syllabus, that repeals by implication are regarded with high disfavor, especially where a statute alleged to have been repealed is founded in experience and grave

considerations of public welfare. It is not possible to conceive of a statute that is more conspicuously founded upon experience and grave considerations of public welfare than the statute of 1901 and doubtless my associates would agree with me in this statement. In no event should a repeal by implication be declared, unless there is an irreconcilable repugnancy or inconsistency between the earlier and the later statute. Astute counsel have not shown wherein there is any repugnancy or inconsistency between the primary election statute and the previous act of 1901 which declared the party itself had the exclusive power of self-government and to settle factional disputes. The only claim that the statute of 1901 is repealed by implication is based upon the assumed fact that the primary election law has made political parties no longer voluntary associations. They are still voluntary as to party disputes, and involuntary only so far as required to conform to statutory provisions. The fact is that the two acts in question are entirely harmonious. The 1901 act says that the state central committee "shall have full power to pass upon and determine all controversies concerning the regularity of the organization of that party  *  *  *  and may make such rules governing the method of passing upon and determining such controversies as it may deem best", except where the state convention of a party has already provided such rules. Section 21 of the new act, instead of containing anything inconsistent or repugnant with the language of the 1901 act, expressly says: "The State Central Committee shall have power to make all rules for party government." So that, it is clear that the primary act of 1910 expressly confers, as did the act of 1901, upon the state central committee the power to make all rules for party government and thereby is negatived the idea that any such power is vested in the courts. Such determinations of the State central committee are declared to be final. If our General Assembly by the 1910 primary act intended to repeal the act of 1901, it is strange, indeed, that in the later act it inserted, in substance, the very

words found in the 1901 act which, in the Lowry case, *supra*, we said made the state central committee the sole tribunal to determine party disputes.

Finally, in September, 1922, an application for a Writ of Prohibition was filed in this court entitled: *Hagerman, et al. v. Snedaker, et al.* Its object was to prohibit further action by the district court of Denver in an equity suit there pending, wherein certain persons claiming to be the legally constituted Republican county central committee of the City and County of Denver asked equitable relief against another and rival committee (and its chairman) which claimed to be the Republican county committee; the specific relief demanded being an injunction to restrain defendants there from proceeding to organize and elect a chairman until the matter in dispute between these rival claimants should be settled by the state central committee of the party, which was the sole tribunal for the settlement of such disputes. The election commission of the City and County of Denver was made a party, but the only relief asked against it was to restrain it until further order of the court from certifying, under the primary election law, the names of the defendants and its chairman until the state committee had acted. The district court issued a temporary writ of injunction as prayed for, whereupon Joseph J. Vick Roy, claiming to be the chairman of the defendant county committee, and George L. Sopris, as chairman of the election commission, applied to this court for a writ of prohibition to stay further action, and based the application here upon the ground that the courts have no jurisdiction of such a controversy, even to issue a temporary writ of injunction to stay proceedings until the constituted tribunal of the party had an opportunity to meet and pass upon a dispute. When the action was pending in the district court the defendants there, Vick Roy and Sopris, who were the petitioners for the writ of prohibition in this court, moved to dismiss the equity action upon these grounds: "(1) That this Court has no jurisdiction to hear and determine the above entitled cause. (2)

That the questions sought to be raised are purely political and are not legal or equitable, and that it is stated in said complaint that the tribunal before which any such questions shall be raised shall be and is the Republican Party State Central Committee."

There were other grounds for the motion, but they concern questions which went merely to the sufficiency of the complaint to state a cause of action and certain other matters that are not important at this time.  When the case reached this court a hearing was had.  Neither party in that case, either in the district court or in the Supreme Court, contended that the courts had jurisdiction to determine party disputes.  The plaintiff in that equity suit below, as upon the prohibition hearing in this court, claimed that a court of equity had jurisdiction, not to settle party disputes, but to preserve the *status quo* until the proper tribunal, namely, the Republican state central committee, could meet and decide it.  In the petition to this court for the writ of prohibition, the relator Vick Roy, who is the same person as the Vick Roy in the present action, averred and included as a part of his petition, his motion to dismiss filed in the court below, in which he stated that the courts had no jurisdiction of such controversies and the state central committee was the sole tribunal vested with such power.  He further expressly alleged in his petition: "That it affirmatively appears upon the face of said complaint that the questions sought to be raised are political and not legal or judicial, and that the proper place for so hearing and determining said questions is before a certain organization named in said complaint as The Republican Party State Central Committee of Colorado, * * * That the rights, if any, of the plaintiffs in said complaint are purely political rights and privileges, and there are no emoluments or salaries connected with said offices.  That the questions sought to be raised are purely political—are not legal or equitable—and it expressly appears in said complaint that the tribunal before which any

such questions shall be raised and decided, shall be, and is The Republican Party State Central Committee."

There could be no more explicit declarations than these that in the application then before this court for a writ of prohibition the ground for granting the writ was that the courts of this state have no power or jurisdiction to inquire into or settle the factional disputes of a political party. That was the position taken two years ago by Vick Roy, the plaintiff in error here. That position was sustained by this court then and it granted him a writ of prohibition and ordered the district court to dismiss his adversaries' suit on the ground that the courts had no jurisdiction of such party disputes. In one sense it may not be important that the position on a question of law taken by a party in one suit is directly contrary to that advanced by him in another action, where precisely the same rights are asserted in both. This does not conclude a court as to what the law of the case is, but, to say the least, one who assumes such an equivocal position does not commend himself to a judicial tribunal which should not be astute to administer to him a relief in a pending action which he expressly said his adversary was not entitled to in a former judicial proceeding in the same court, and which this court withheld from that adversary.

But the real point is that this court, two years ago, where the same legal questions were involved and where the rights of the same party were in issue, then held that the courts had no jurisdiction in party disputes of this nature. At that time the primary law of 1910 was in force. No opinion was rendered in the Hagerman case *supra,* but the record shows that the writ of prohibition was issued as prayed for and the district court was restrained, all the four participating judges concurring. The writ should not have gone, and would not have been issued, if the district court possessed jurisdiction in the premises. This court is not unaware of its own previous decision that the primary election act of 1910 did not repeal the 1901 act which gave to the Republican state central committee

sole jurisdiction in such circumstances.   I, therefore, say that we should adhere to our previous decisions, and contrary decisions of other courts under similar or dissimilar statutes should not be followed.   I believe that it is for the best interests not only of the judiciary but likewise of the political parties and of the people of this state, that where a decision can be made, as it can be here, based upon sound reason and by a fair construction of our Constitution and statutes, that divests the courts of jurisdiction over factional disputes of political. parties, it, and not one to the contrary, should be made.   That power resides in, and should be continued in, the political parties themselves. Ever since the decision in the Lowry case was handed down all the political parties of this state have proceeded and acted upon the theory that the courts are not clothed with this jurisdiction and that the parties themselves still possess, what originally was conceded to be, their unquestioned power to settle their own factional disputes.   Repeated sessions of our General Assembly have been held since the Lowry decision was pronounced and it is significant that no attempt has been made by statute looking to a repeal of the 1901 act, or to an investiture of power in the courts, if that could constitutionally be done, of control over political parties, further than to compel them to conform to the provisions of the primary election statute which is administered solely by public administrative officers.

The mere fact that judges may be embarrassed because of their interest in the result is, of course, no reason why they should not, in a proper case, pass upon political questions, if the legislature has the power, and has conferred the power, of control upon its legal tribunals.   It is part of the history of this state that some of the ablest and purest-minded judges who ever sat upon this bench, have been defeated for re-nomination, or at the polls on election day, for their decisions in these perplexing and ofttimes wholly unnecessary party disputes.   If in a controversy between two rival parties the decision of the court is

against the one with which they do not affiliate, the judges are often charged with political prejudice; if the decision is against a faction of their own party, with venality and personal interest. It makes no difference whether their decisions are right or wrong. While a majority of the voters do not visit their wrath upon judges with whom they disagree, there is always an element among politicians whose estimate of the ability and integrity and character of a judge is guaged by the pleasure or displeasure with which they receive his decisions on political party disputes. If there ever was a case in which I have participated without embarrassment, this is one. For aught I know the result of granting this writ may be gratifying to me personally; on the other hand it may be displeasing. Whether or not there is any significance in this application, other than that which naturally accompanies a contest between rival claimants to the chairmanship of a political committee, this record does not disclose, and I am glad to be able to say that I am not aware that it affects either my principles, concerns my preferences, or appeals to my prejudices. The chief, if not the only, reason for this already too long opinion is because I am profoundly convinced that the courts do not have the jurisdiction asserted, and that the General Assembly has not even attempted to confer it upon them. If, however, it had attempted to do so, in my judgment its act purporting to confer such a grant of power would be unconstitutional and void. This is not a new conviction but it has been abiding since my earliest connection with this court and from the time I participated in the first case of the kind years ago. My observation and experience in these matters have convinced me not only of the unwisdom of an attempt to confer such power, but likewise of the lack of legislative authority under the Constitution to confer it. This court, therefore, after all that has taken place in this state, as evidenced by our published opinions, and because of the avowed intention of the highest law-making body not to invest the courts, even if it had the power, with such a questionable grant of juris-

diction, should unhesitatingly now, as it summarily did two years ago, refuse to permit any judicial tribunal in this state to interfere with, or pass upon, purely political controversies of a political party.

For these reasons I have filed this dissenting opinion and am authorized to say for Mr. Justice Allen that he concurs in it.